**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DAVID BUTLER, Derivatively on Behalf of Nominal Defendant THE HONEST COMPANY, INC., <br><br> Plaintiff, <br><br> v. <br><br> NIKOLAOS VLAHOS, KELLY KENNEDY, JESSICA WARREN, KATIE BAYNE, SCOTT DAHNKE, ERIC LIAW, JEREMY LIEW, and AVIK PRAMANIK, <br><br> Defendants, <br><br> and <br><br> THE HONEST COMPANY, INC., <br><br> Nominal Defendant. | C.A. No. <br><br><br><br> **JURY TRIAL DEMANDED** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

By and through his undersigned counsel, Plaintiff David Butler ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant The Honest Company, Inc. ("Honest" or the "Company") and against certain current and former officers and directors of the Company for violations of the Securities Act of 1933 (the "Securities Act"), breaches of fiduciary duties, unjust enrichment, and waste of corporate assets. Plaintiff makes these allegations based on personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by Honest and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications

disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on Honest's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related consolidated securities fraud class action lawsuit captioned *Cody Dixon v. The Honest Company, Inc. et al.*, Case No. 2:21-cv-7405 (C.D. Cal.) (the "Related Securities Action"); and (e) review of other publicly-available information concerning Honest and the Defendants.

## NATURE OF THE ACTION

1.      Plaintiff brings this action derivatively for the benefit of Nominal Defendant Honest against certain current and former executive officers and directors of the Company with the purpose of rectifying the Defendants' violations of the Securities Act and breaches of fiduciary duties for issuing false and misleading statements and/or omitting material information in the Offering Documents (defined herein) issued in connection with the Company's initial public offering (the "IPO" or "Offering") commenced on or about May 4, 2021.

2.      In one of her first communications to investors, Honest Founder Jessica Alba shared an important sentiment: "[Trust] is hard to earn and it's easy to lose." Honest's customers and investors would agree.

3.      Defendant Honest develops, markets and sells clean and sustainable household and personal care products. The Company describes itself as focused on "leading the clean lifestyle movement" and "creating a community for conscious consumers." Of Honest's three business segments—Diapers and Wipes, Skin and Personal Care, and Household and Wellness—its Diapers and Wipes category accounts for the majority of Honest's revenue.

4.      At the time of Honest's May 2021 IPO, as further alleged below, Honest was experiencing a deceleration in sales—following both the January 2021 introduction of a newly formulated Clean Conscious Diaper, which customers have claimed is subject to leaks, blowouts, and causing rashes, and a decline in demand following an undisclosed year-long COVID-19 consumer stock-up.

5.      Despite these then-existing facts, the Offering Documents told investors that Honest's diapers were an important "strategic customer acquisition tool" to introduce consumers to the brand and increase the likelihood that they will purchase products from Honest's remaining segments. The Offering Documents also emphasized Honest's Clean Conscious Diaper as a key example of the Company's product innovation and continuous improvement in existing products' safety, sustainability, efficacy, and design and touted Honest's omnichannel strategy as central to its growth by having Honest products available wherever customers want to shop—whether in-store at major retailers, online, or at Honest.com.

6.      On the other hand though, the Offering Documents failed to disclose that customers did not view its new Clean Conscious Diaper as either safe or effective—as evidenced by a flood of online consumer reviews on Honest's major retailer sites and social media platforms describing chemical irritation and rashes, leaks, and blowouts amongst users. As early as February 2021, many customers promised to stop buying Honest diapers and cancel their subscriptions because of the new and problematic Clean Conscious Diaper formula.

7.      The Offering Documents also incorrectly touted the boon the COVID-19 pandemic had been for the Company while describing the potential negative impact of COVID-19 in generalized terms and as unascertainable. In reality, retailers were destocking COVID-19 products and demand for these products were decreasing as consumers had stocked up on these products

during 2020. Although Honest was tracking inventory daily and monitoring trends monthly such that the deceleration in sales would be readily apparent at the time of the IPO, it was not until months later that Defendant Vlahos acknowledged that the Company experienced a COVID-19 stock-up over the past year—at least nine months before the IPO.

8.      As a result of these undisclosed, adverse facts, Honest's stock plummeted, falling from its offering price of $16.00 per share to close at $10.55 on September 15, 2021.

## JURISDICTION AND VENUE

9.      Pursuant to 28 U.S.C. §1331 and section 21D of the Securities Act (15 U.S.C. § 77v), this Court has jurisdiction over the claims asserted herein under Section 11 of the Securities Act.

10.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

### A.    Plaintiff

12.    Plaintiff has been a shareholder during the Relevant Period, is currently, and at all relevant times has been, a holder of Honest common stock.

### B.    Honest

13.    Nominal Defendant Honest is incorporated in Delaware and its current principal executive offices are located at 12130 Millennium Dr., #500, Los Angeles, CA, 90094. Honest claims to be a digitally-native, mission-driven brand focused on leading the clean lifestyle movement, creating a community for conscious consumers and seeking to disrupt multiple consumer product categories. The Company's stock is listed under the ticker symbol "HNST" on Nasdaq Global Market ("NASDAQ").

### C.    Individual Defendants

14.    Defendant Nikolaos Vlahos ("Vlahos") is currently, and was at the time of the IPO, the Chief Executive Officer ("CEO") and a director of the Company. For the fiscal years of 2021 and 2020, Defendant Vlahos received $13,864,207 and $6,800,907 in total compensation, respectively. As of April 14, 2022, Vlahos beneficially owned 4,953,858 shares of Honest's common stock. Vlahos—by virtue of his position as CEO and director of the Company—reviewed, approved, and signed the Registration Statement. As such, the statements made therein are also the statements of Defendant Vlahos.

15.    Defendant Kelly Kennedy ("Kennedy") is currently, and was at the time of the IPO, the Executive Vice President and Chief Financial Officer ("CFO") of the Company. For the fiscal year 2021, Defendant Kennedy received $6,811,931 in total compensation. As of April 14, 2022, Kennedy beneficially owned 219,828 shares of Honest's common stock. Kennedy—by virtue of

her position as Vice President and CFO of the Company—reviewed, approved, and signed the Registration Statement. As such, the statements made therein are also the statements of Defendant Kennedy.

16.     Defendant Jessica Warren ("Warren" or "Alba")[1] is currently, and was at the time of the IPO, the Chief Creative Officer and a director of the Company. For the fiscal years of 2021 and 2020, Defendant Warren received $7,981,543 and   $2,330,713 in total compensation, respectively. As of April 14, 2022, Warren beneficially owned 6,053,687 shares of Honest's common stock. Warren—by virtue of her position as CCO and director of the Company—reviewed, approved, and signed the Registration Statement. As such, the statements made therein are also the statements of Defendant Warren.

17.     Defendant Katie Bayne ("Bayne") is currently, and was at the time of the IPO, a director of the Company. As of April 14, 2022, Bayne beneficially owned 122,036 shares of Honest's common stock. Bayne—by virtue of her position as a director of the Company—reviewed, approved, and signed the Registration Statement. As such, the statements made therein are also the statements of Defendant Bayne.

18.     Defendant Scott Dahnke ("Dahnke") was, at the time of the IPO, a director of the Company. As of April 14, 2022, Dahnke beneficially owned 12,183,799 shares of Honest's common stock. Dahnke—by virtue of his position as a director of the Company—reviewed, approved, and signed the Registration Statement. As such, the statements made therein are also the statements of Defendant Dahnke.

---

[1] The Offering Documents refer to founder, Chief Creative Officer, and former Chair of Honest's board of directors Jessica Warren as Jessica Alba throughout the Prospectus (as defined herein).

19.     Defendant Eric Liaw ("E. Liaw") is currently, and was at the time of the IPO, a director of the Company. As of April 14, 2022, E. Liaw beneficially owned 16,577 shares of Honest's common stock. E. Liaw—by virtue of his position as a director of the Company—reviewed, approved, and signed the Registration Statement. As such, the statements made therein are also the statements of Defendant E. Liaw.

20.     Defendant Jeremy Liew ("J. Liew") was, at the time of the IPO, a director of the Company. As of April 14, 2022, J. Liew beneficially owned 119,686 shares of Honest's common stock. J. Liew—by virtue of his position as a director of the Company—reviewed, approved, and signed the Registration Statement. As such, the statements made therein are also the statements of Defendant J. Liew.

21.     Defendant Avik Pramanik ("Pramanik") is currently, and was at the time of the IPO, a director of the Company. As of April 14, 2022, Pramanik beneficially owned 14,383 shares of Honest's common stock. Pramanik—by virtue of his position as a director of the Company—reviewed, approved, and signed the Registration Statement. As such, the statements made therein are also the statements of Defendant Pramanik.

22.     Defendants Vlahos, Warren, Bayne, Dahnke, E. Liaw, J. Liew, and Pramanik are collectively referred to hereinafter as the "Director Defendants."

23.     Defendant Kennedy, along with the Director Defendants, are collectively referred to hereinafter as the "Individual Defendants."

24.     Nominal Defendant Honest, along with the Individual Defendants, are collectively referred to hereinafter as the "Defendants."

**D.     Related Party Non-Defendants**

25.     Related Party Non-Defendant James D. White ("White") is currently the Chairman of the Board of Honest. White is named solely for the purpose of demand futility.

26.     Related Party Non-Defendant Susan Gentile ("Gentile") is currently a director of Honest. Gentile is named solely for the purpose of demand futility.

27.     Related Party Non-Defendant Julia M. Brown ("Brown") is currently a director of Honest. Brown is named solely for the purpose of demand futility.

28.     Related Party Non-Defendant John R. Hartung ("Hartung") is currently a director of Honest. Hartung is named solely for the purpose of demand futility.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

29.     By reason of their positions as officers, directors, and/or fiduciaries of Honest and because of their ability to control the business and corporate affairs of Honest the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Honest in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of Honest and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

30.     Each director and officer of the Company owes to Honest and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

31.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to

the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

**Duties of the Members of the Audit Committee**

32.     Pursuant to Honest's Charter of the Audit Committee (amended as of May 4, 2021)[2], the purpose of the Audit Committee of the Board of Directors of The Honest Company, Inc. (the "Company") is to:

- oversee the Company's accounting and financial reporting processes, systems of internal control, financial statement audits and the integrity of the Company's financial statements;

- manage the selection, engagement terms, fees, qualifications, independence and performance of the registered public accounting firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services (the "Auditors");

- maintain and foster an open avenue of communication with the Company's management, internal audit group (if any) and Auditors;

- review any reports or disclosures required by applicable law and listing requirements of the Nasdaq Stock Market (the "Exchange");

- oversee the design, implementation, organization and performance of the Company's internal audit function (if any);

- review and approve revisions to the Company's Investment Policy;

- help the Board oversee the Company's legal and regulatory compliance, including risk assessment; and

- provide regular reports and information to the Board.

33.     The responsibilities of the Audit Committee include the following, among others:

The Committee's responsibilities are for oversight, as described under "Purpose" above. The members of the Committee are not employees of the Company and they do not perform management's or any Auditors' functions. The Committee relies on the expertise and knowledge of management, the internal auditors (if any) and any Auditors in carrying out its oversight responsibilities. Management is responsible

---

[2] Available at https://investors.honest.com/static-files/abee8883-ab7b-4bcd-8db1-da434fa13ae9

for preparing accurate and complete financial statements in accordance with GAAP, crafting periodic reports and establishing and maintaining appropriate accounting principles and financial reporting policies and satisfactory internal control over financial reporting. The Auditors will audit the Company's annual consolidated financial statements and, when required, the effectiveness of the Company's internal control over financial reporting and review the Company's quarterly financial statements. It is not the Committee's responsibility to prepare or certify the Company's financial statements, guarantee the audits or reports of the Auditors, certify as to whether any Auditors are "independent" under applicable law or Exchange listing requirements, or ensure that the financial statements or periodic reports are complete and accurate, conform to GAAP, or otherwise comply with applicable law or Exchange listing requirements or the Company's policies.

The Committee shall have the following responsibilities; *provided*, *however*, that this list of responsibilities is intended to be a guide and to remain flexible to account for changing circumstances and needs. Accordingly, the Committee may depart from or supplement such responsibilities and establish policies and procedures, to the extent permitted by applicable law and Exchange listing requirements.

*Auditor Management*

1.      **Evaluation and Retention of Auditors.** The Committee will evaluate, determine whether to retain and determine the fees of any Auditors and any other registered public accounting firm engaged for the financial reporting process. In addition, the Committee may replace any existing Auditors or other registered public accounting firm engaged for the financial reporting process with a different public accounting firm.

2.      **Approving Audit and Non-Audit Engagements**. The Committee will review audit plans, the adequacy of staffing, the fees to be paid to Auditors and oversee the negotiation and execution of any engagement letters on behalf of the Company. The Committee will oversee the rotation of the Auditors' partners on the Company's audit engagement team as required by applicable law and Exchange listing requirements. The Committee will approve all audit and non-audit related services that the Auditors provide to the Company before the engagement begins, unless applicable law and Exchange listing requirements allow otherwise. The Committee may establish pre-approval policies and procedures or delegate preapproval authority to one or more Committee members as permitted by applicable law and Exchange listing requirements.

3.      **Auditor Independence.** Prior to engagement of any prospective Auditor, and at least annually thereafter, the Committee will assess the qualifications, performance and independence of the Auditors, or in the case of prospective Auditors, before they are engaged. That assessment will include reviewing written disclosures from any Auditors regarding any relationships they have that may affect independence, as defined by applicable law and Exchange

listing requirements. The Committee will review a written statement from any Auditors affirming their independence and assess, consider and discuss with them any potential relationships concerning their objectivity and independence.

      4.     **Former Employees of Auditors.** The Committee will oversee the policies and procedures as required by applicable law and Exchange listing requirements governing how the Company may employ individuals who are or once were employed by the Auditors.

*Financial Review and Disclosure*

      5.     **Annual Audit Results.** The Committee will review with management and the Auditors the results of the Company's annual financial statement audit, including:

- the Auditors' assessment of the quality of the Company's accounting principles and practices;

- the Auditors' views about qualitative aspects of the Company's significant accounting practices and the reasonableness of significant judgments and estimates (including material changes in estimates and analyses of the effects of alternative generally accepted accounting principles ("GAAP") methods on the financial statements);

- all misstatements identified during the audit (other than those the Auditors believe to be trivial);

- the adequacy of the disclosures in the financial statements; and

- any other matters that the Auditors must communicate to the Committee under applicable accounting or auditing standards.

      6.     Audited Financial Statement Review; Quarterly and Annual Reports. The Committee will review the annual audited financial statements, the quarterly financial statements and the Company's "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors," as appropriate, with management and the Auditors. The Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in the Company's Annual Report on Form 10-K.

      7.     Earnings Announcements. The Committee will review and discuss with management and the Auditors any proposed earnings press releases and other financial information and guidance regarding the Company's results of operations

provided publicly or to analysts and ratings agencies (including, without limitation, reviewing any pro forma or non-GAAP information).

    **8.**    Proxy Report. The Committee will oversee the preparation of any report of the Committee required by applicable law or Exchange listing requirements to be included in the Company's annual proxy statement.

    **9.**    Accounting Principles and Policies. The Committee will review and discuss with management and the Auditors significant issues regarding accounting principles and financial-statement presentation, including:

- critical accounting policies and practices;

- alternative accounting policies available under GAAP;

- the potential impact on the Company's financial statements of alternative treatments and any off-balance sheet structures; and

- any other significant reporting issues and judgments, significant regulatory, legal and accounting initiatives, or developments that may have a material impact on the Company's financial statements, compliance programs and policies. The Committee will review with the Auditors and management, if appropriate, any written communication, such as any management letter or internal-control letter and monitor management's response to such communications.

    **10.**    Auditor Communications. At least annually, the Committee will discuss with the Auditors the matters required to be discussed by Auditing Standard No. 1301, Communications with Audit Committees, as adopted by the PCAOB (including any successor rule adopted by the PCAOB).

    **11.**    Management Cooperation with Audit. The Committee will evaluate management's cooperation with the Auditors during their audit examination, including any significant difficulties or disagreements encountered during the audit, if any.

    **12.**    National Office Communications. To review with the Auditors, as appropriate, communications between the audit team and the Auditors' national office with respect to accounting or auditing issues presented by the engagement.

***Internal Control and Procedures***

    **13.    Risk Assessment and Management.** The Committee will review and discuss with management and the Auditors the Company's processes and policies on risk identification, management and assessment in all areas of the Company's business, but the Board shall continue to have overall responsibility for

evaluating key business risks faced by the Company, including but not limited to information security and cybersecurity, competition and regulation. Areas of focus for the Committee shall include the Company's policies and other matters relating to the Company's investments, cash management and foreign exchange management, major financial risk exposures, the adequacy and effectiveness of the Company's information security policies and practices and the internal controls regarding information security and the steps taken by management to monitor and mitigate or otherwise control these exposures and to identify future risks. The Committee will review and discuss with management the adequacy of the Company's insurance programs, including director and officer insurance, product liability insurance and general liability insurance.

14.     **Internal Auditors.** The Company does not currently have an Internal Audit function. If an internal audit function is established and becomes operational, the Committee will review the audit plan of the Company's internal audit team and discuss with that team the adequacy and effectiveness of the Company's scope, staffing and general audit approach. The Committee will review any significant reports prepared by the Company's internal auditors, as well as management's response. The head of the internal auditors will also report to and be evaluated by the Committee.

15.     **Internal Control over Financial Reporting; Disclosure Controls.** The Committee will confer with management and the Auditors concerning the scope, design, adequacy and effectiveness of internal control over financial reporting and the Company's disclosure controls and procedures. The Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies.

16.     **Correspondence with Regulators.** The Committee will consider and review with management, the Auditors and outside advisors or accountants any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

17.     **Internal Control Report.** At least annually (if required by Exchange listing requirements) or as may otherwise be determined by the Committee, the Committee will review a report by the Auditors describing its internal quality-control procedures and any material issues raised by (a) that firm's internal quality-control review, (b) any peer review of the firm's internal quality-control procedures or review, or (c) any inquiry or investigation by governmental or professional authorities conducted in the last five years of any audit performed by the Auditors.

18.     **Complaint Procedures.** The Committee will oversee procedures for receiving, retaining and investigating the following:

- complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; and

- confidential and anonymous submissions by employees concerning questionable accounting or auditing matters. In addition, the Committee will oversee procedures for receiving, retaining and investigating any "hotline" complaints or submissions delegated to the Committee by the Board.

19.    **Ethical Compliance.** The Committee will review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure compliance with applicable laws and Exchange listing requirements, including the Company's Code of Business Conduct and Ethics ("Code") and Whistleblower Policy. The Committee will consider any request by directors or executive officers of the Company for a waiver from the Code. Any approved waivers shall be promptly disclosed as required by applicable law and Exchange listing requirements.

20.    **Related Person Transactions.** The Committee will review and approve, in accordance with the Company's policies, any related person transaction as defined by applicable law or Exchange listing requirements.

21.    **Investment Policy.** The Committee will review and approve revisions to the Company's Investment Policy.

22.    **Committee Self-Assessment; Charter Review.** The Committee will annually evaluate its performance. The Committee shall also review and assess the adequacy of this Charter annually and shall recommend any proposed changes to the Board for its consideration and approval.

23.    **Other Legal and Finance Matters.** The Committee will review with management legal and regulatory compliance and any actual, pending or threatened legal or financial matters that could significantly affect the Company's business or financial statements or as otherwise deemed appropriate by the Committee.

24.    **General Authority.** The Committee shall perform such other functions and have such other powers as may be necessary or appropriate in the discharge of any of the foregoing.

### Duties Pursuant to the Company's Code of Conduct

34.    The Individual Defendants, as officers and/or directors of Honest, were also bound by the Company's Code of Business Conduct and Ethics (the "Code") which, according to the

Code, sets out basic principles to guide all directors, officers, and employees of Honest, who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.

35.     Regarding basic general principles of conduct, the Code states that:

It is our policy to promote high standards of integrity by conducting our affairs in an honest and ethical manner. The Company's integrity and reputation depends on the honesty, fairness and integrity brought to the job by each person associated with us. Unyielding personal integrity and sound judgment is the foundation of corporate integrity.

36.     Concerning public reporting of the Company's financial records, the Code states that:

The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees and others with whom we do business. As a result, it is important that our books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities. We require that:

- no entry be made in our books and records that intentionally hides or disguises the nature of any transaction or of any of our liabilities or misclassifies any transactions as to accounts or accounting periods;

- transactions be supported by appropriate documentation;

- the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in our books and records;

- employees comply with our system of internal controls; and

- no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund.

Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the SEC. Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about the Company that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures. In addition:

- no employee may take or authorize any action that would intentionally cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

- all employees must cooperate fully with our Finance and Accounting Department, as well as our independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; and

- no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

Any employee who becomes aware of any departure from these standards has a responsibility to report his or her knowledge promptly to a supervisor, the Compliance Officer, the Audit Committee of the Board or otherwise in accordance with the provisions of the Company's Whistleblower Policy on reporting complaints regarding accounting and auditing matters.

37.     Upon information and belief, the Company maintained versions of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

**Control, Access, and Authority**

38.     The Individual Defendants, by virtue of their positions of control and authority as directors and/or officers of Honest, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Honest.

39.     By virtue of their advisory, executive, managerial, and directorial positions with Honest, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Honest.

40.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Honest and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

41.     To discharge their duties, the officers and directors of Honest were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Honest were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d) remain informed as to how Honest conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that Honest was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

42.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to Honest and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Honest, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Honest, the absence of good faith on their part, and a reckless disregard for their duties to Honest and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Honest.

43.     The Individual Defendants each breached their duties of loyalty and good faith by allowing the Individual Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that led shareholders to believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

44.     In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Related Securities Action that alleges violations of the federal securities laws. As a result, Honest has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

45.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided, abetted, and/or assisted each other in breaching their respective duties.

46.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

47.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties, unjust enrichment, gross mismanagement, and abuse of control; and (ii) disguise and misrepresent the Company's actual business and financial prospects.

48.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial

participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

49.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### A.    Honest's Business and Omnichannel Approach

50.    Honest describes itself as a digitally-native, mission-driven brand focused on leading the "clean lifestyle movement," creating a community for conscious consumers and seeking to disrupt multiple consumer product categories. According to Honest, since its launch in 2012, Honest has been dedicated to developing clean, sustainable, effective and thoughtfully designed products with transparency. Honest's products contain primarily "better-for-you" products, including clean and natural categories of diapers, personal care, and household wellness products. According to the Company, Honest had developed its products with transparency and as a result had "cultivated deep trust around what matters most to [its] consumers: their health, their families and their homes."

51.    Honest's three main categories are: (i) Diapers and Wipes; (ii) Skin and Personal Care—which includes shampoo, conditioner, body wash, lotions and the Company's Clean Beauty category; and (iii) Household and Wellness—which includes cleaning supplies, sanitizers and disinfectants, feminine care products, and vitamins. These categories represented 63%, 26%, and 11% of the Company's 2020 revenue, respectively.

52.     Its largest segment, Diapers and Wipes, is described in the Offering Documents as the center of Honest's product ecosystem, serving as an entry point for new parents to become customers for everyday family needs. According to Honest, its multi-category product architecture is designed to drive loyalty, increase its consumer wallet share, and generate attractive consumer lifetime value.

53.     According to the Company, Honest's diapers serve as a strategic customer acquisition tool, as new parents then often purchase wipes and other Honest products from the Company's Skin and Personal Care and Household and Wellness categories. In 2020, the Company commissioned a third-party study that showed nearly 90% of its diaper buyers expanded their purchases beyond diapers and nearly half of diaper buyers have purchased two or more of Honest's non-diaper products.

54.     Honest describes itself as an omnichannel brand, meaning its products are available regardless of where customers shop, whether through Honest's own ecommerce site, another online retailer, or in the traditional retail space. In other words, as stated in the Offering Documents, Honest's "omnichannel approach seeks to meet consumers however they want to shop." According to its Offering Documents, Honest's "differentiated platform positions [it] for continued growth through [its] trusted brand, award-winning multi-category product offering, deep digital-first connection with consumers and omnichannel accessibility."

55.     Honest's products are sold on its flagship digital platform and in retail channels that include Costco, Target, and Amazon. In 2020, Honest generated 55% of its revenue from its Digital channel and 45% of its revenue from its Retail channels. Honest's products can be found in approximately 32,000 retail locations across the United States, Canada, and Europe.

56.     According to the Company "[t]his distinctive business model has allowed us to efficiently scale our business while remaining agnostic as to the channel where consumers purchase our products."

57.     Nevertheless, Honest told investors that there is "a fundamental channel shift [] underway across the Diapers and Wipes, Skin and Personal Care and Household and Wellness markets." According to Honest, these products had historically been sold through traditional, wholesale, store-based channels, which accounted for approximately 80% of U.S. retail sales in these markets in 2019. According to Honest, however, from 2014 to 2019, total ecommerce sales grew at seven times the rate of brick-and-mortar store-based sales. To this point, Honest touted to investors that it expected these trends would not only continue but would accelerate globally.

**B.      Honest's Clean Conscious Diaper**

58.     According to Honest, diapers are at the "center of [Honest's] product ecosystem," serving as a strategic customer acquisition tool that acts as an entry point for Honest's product portfolio and leads customers to purchase products from other categories. Put differently, the diapers category serves as an integral entry point for Honest which materially impacts customer purchasing and retention of the Company's other products. As explained in the Prospectus, Honest commissioned a third-party study in 2020 that found nearly 90% of Honest's surveyed diaper buyers expanded their purchases. Nearly half of diaper buyers surveyed purchased two or more of Honest's non-diaper products.

59.     To the point of purported customer synergies, Honest's self-proclaimed mantra is "costovation," which, as defined, refers to Honest's touted goal of continuously improving the safety, sustainability, efficacy, and design profile of its existing suite of products.

60.     Relevant here, a key example of Honest's "costovation" strategy was the introduction of the Clean Conscious Diapers line of products in January 2021. According to Honest, these diapers are made with plant-based materials, packaged in 100% recyclable boxes, and premised on new technology which improves absorption while at the same time reduces the material used for each diaper.

61.     The Clean Conscious Diapers design includes a quilted bubble liner, toxicologist-verified wetness indicator, and a quick absorb channel to better help control leaks and keep the baby dry. The Clean Conscious Diapers also offer customized enhancements for each age, including a belly button cutout for additional comfort (Newborns), double poo pockets to prevent blowouts (Sizes 1–2), and stretch comfort for more active babies (Sizes 3–6).

62.     In reality, however, shortly after its introduction—and months prior to the IPO—Honest's Clean Conscious Diaper caused leaks, blowouts, and rashes on its child users.

63.     One confidential witness from the Related Securities Action ("CW-1") started working for Honest in early 2020 and was a Manager of Social Marketing for all of Honest's products from the start of 2021 through her departure a month after the IPO.[3]

64.     CW-1 stated that in January 2021, Honest changed their diaper technology. According to CW-1, customers were very unhappy about the change because, although the newer diapers were more eco-conscious, they did not work as well as the previous versions. CW-1 added that once the new diapers "crashed and burned," she got a sense that things were not great at the Company. Many consumers shared their negative experiences with the new formula and its failure to guard against leaking and blowouts online.

---

[3] For ease of comprehension and readability, the Complaint uses the pronoun "she" and possessive "her" in connection with former Honest employees. This convention, however, is not meant to identify the actual gender of any of the former employees.

65.     Several customers explained that, despite having been loyal Honest customers, the new Clean Conscious Diaper came with unexpected and frightening side effects, including "permanent rash[es]," "chemical irritation," "big" and "constant leaks," as well as issues with the "poorly made" diaper lining and wetness indicator. In an understandable uproar, many customers stated they would no longer purchase Honest diapers.

66.     In addition to expressing general outrage on social media, including the Company's Facebook page, Honest customers left targeted comments on the Company's announcement of the Clean Conscious Diaper. Many of these aggrieved consumers received responses from the Honest Company asking to learn more about their negative experiences.

67.     Notwithstanding the then-present and disastrous reception of the Clean Conscious Diaper, Honest's Offering Documents touted product innovation as central to its growth and described its diapers as a "strategic customer acquisition tool."

**C.      Honest's "Growth"**

68.     Honest told investors in the Offering Documents that the "clean and natural" segments of Diapers and Wipes, Skin and Personal Care, and Household and Wellness markets were growing at outsized rates as a result of demand for "better-for-you" products. Honest pointed to several performance metrics in its Offering Documents to demonstrate to investors that the Company was part of this growth.

69.     According to Honest, the Company's trusted brand, innovative product offering, deep consumer connection and differentiated omnichannel presence had driven strong performance at Honest. For example, Honest grew revenue 27.6% from $235.6 million in 2019 to $300.5 million in 2020 with revenue in its Diapers and Wipes, Skin and Personal Care, and

Household and Wellness categories growing by 16.4%, 35.5%, and 116.5% respectively, from 2019 to 2020.

70.     Regarding COVID-19, the Offering Documents disclosed that Honest's employees had transitioned to working from home and that Honest was subject to the general risk that the "COVID-19 pandemic could have an adverse effect on [its] business, financial condition, results of operations and prospects." In spite of these boilerplate warnings, the COVID-19 pandemic was portrayed in the Offering Documents as a boon to Honest's business and growth.

71.     As Honest has explained, "[w]hen the COVID-19 pandemic hit and we went into lockdown, people became more aware of their health and what they bring into their homes," and in less than six months after the onset of COVID-19, Honest created and brought to market a new Stay Safe cleaning collection, a complete set of cleaning, sanitizing, and disinfecting solutions. Moreover, Honest told investors that "COVID-19 has been one of the drivers of demand in [its] Digital channel as consumers shifted to online shopping amid the pandemic. Additionally, [its] Household and Wellness product category has benefitted from increased demand for sanitization products."

72.     Honest went on to say that it could offer no assurance that it would continue to experience such increases in demand or that there might be a decline in the use of online shopping or demand for sanitization products when the COVID-19 pandemic subsides. Nevertheless, the Offering Documents offered these statements as prognostications about the future and did not disclose that such declines in online shopping or demand for sanitization products had occurred or currently was occurring.

73.     The Offering Documents' portrayal of growth and the COVID-19 pandemic's impact on the Company's business are revealed to be misleading by Lead Counsel's investigation and as well as Defendant Vlahos's admission of a customer "stock up" prior to the IPO.

74.     Another confidential witness from the Related Securities Action ("CW-2") was an accountant at Honest in 2021.

75.     CW-2 was on a distribution list that received a daily report that detailed all of the Company's inventory. CW-2 explained that Honest also monitored trends on a monthly basis to compare how inventory was moving across time periods. According to CW-2, it was clear from the reports and meetings related to those reports that there was a significant decline in the sale of wipes and sanitizers, which she called "COVID products."

76.     CW-2 explained that Honest did not do well with sales for Q1'21 or Q2'21. She attributed this mostly to the decline in sale of the COVID products. CW-2 recalled chatter amongst her colleagues with concerns about the steep decline in sales. CW-2 explained it was clear that COVID products were "not moving" and it was clear from Honest's internal reporting that these products had been trending down for some time.

77.     According to CW-1, the bulk of Honest's business was in the Diaper and Wipes category. Although Honest had always offered sanitizers and wipes, there was a surge in sales of those products during the COVID-19 pandemic.

78.     When asked about the Company's deceleration in business during her tenure, CW-1 stated that it was apparent internally that there was a slow-down in business.

**D.     Honest's IPO**

79.     On or about May 4, 2021, Honest conducted its IPO, in which it sold 29,678,050 shares of common stock to the public, including an underwriter over-allotment option of 3,871,050

shares. Of the shares of common stock offered in the IPO, the Honest Company received the proceeds from 6,451,613 shares and the selling stockholders (as identified in the Prospectus) received the proceeds for the remainder.

80.     The IPO, which was priced at $16 per share, generated over $400 million in proceeds for Honest and the selling stockholders. The IPO was conducted pursuant to, and the sale of Honest stock was solicited by, several documents filed by Honest and the Underwriter Defendants with the SEC and disseminated to the investing public, including (i) an April 9, 2021 registration statement on Form S-1, which following amendment, was declared effective by the SEC on May 4, 2021 (the "Registration Statement"), and (ii) a May 4, 2021 final prospectus, which forms part of the Registration Statement, on Form 424(b)(4) (the "Prospectus" and, together with the Registration Statement, the "Offering Documents.").

81.     The Offering Documents state that "[n]either [Honest], the selling stockholders, nor any of the underwriters have authorized anyone to provide any information or to make any representations other than those contained in this prospectus or in any free writing prospectuses [Honest] ha[s] prepared."

**E.     The Offering Documents Contained Materially False and Misleading Statements of Fact and Omitted Material Information**

82.     The Offering Documents were negligently prepared, and as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing its preparation.

**1.     The Offering Documents Contained Misstatements and Omissions About Honest's Product Innovation and its Clean Conscious Diaper**

83.     The Offering Documents failed to disclose that Honest's introduction of its "clean conscious diaper" was negatively received by customers at the time of the IPO. Although the Offering Documents touted Honest's product innovation and product efficacy as central to its growth and success, in reality, at the time of the IPO, Honest's new Clean Conscious Diaper was causing leaks and rashes among users, such that one of Honest's pivotal products was defective. As a result, the Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements contained therein not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

84.     For example, the Offering Documents told investors that a key aspect of Honest's growth strategy was its ability to drive product innovation, stating:

**Our Growth Strategy**

\*        \*        \*

***Drive Accretive Product Innovation***
        • *Improve Existing Products*. Since our inception, we have been guided by the idea that there is always room for innovation. ***We strive for continuous improvement in our existing products' safety, sustainability, efficacy and design profile, which we refer to as costovation, as exemplified by the introduction of our clean conscious diaper in January 2021***. We believe continuous innovation is important to accelerating our growth, deepening consumer connections and improving the profitability of our product offering.

85.     Likewise, the Offering Documents stated that since its launch in 2012, Honest was "dedicated to developing ***clean***, sustainable, ***effective and thoughtfully designed products***."

86.     Specifically, with respect to Honest's diapers, the Offering Documents touted to investors that "***[a]t the center of our product ecosystem are our diapers, which are a strategic consumer acquisition tool*** that acts as an entry point for our portfolio, as new parents often [then] go on [to] purchase products from our other categories for their everyday family needs."

87.     The above statements were false and misleading statements of material fact when made because they failed to disclose the following material adverse facts, material adverse trends, material uncertainties, or significant risks that existed at the time of the IPO: (a) According to customers experiencing chemical irritations and rashes, leaking and blowouts, Honest's Clean Conscious Diaper reformulation was neither safe nor effective; (b) Honest's Clean Conscious Diaper was not achieving the pillars of Honest's "costovation" strategy, which emphasizes safety, sustainability, efficacy and design profile; (c) Honest was not capturing the benefits of its Diapers as a "strategic customer acquisition tool"; and (d) As a result of the Clean Conscious Diaper's new technology and defective design, Honest would—and did—lose customers and revenue.

88.     The Offering Documents also described product innovation as "the heart of [Honest's] business," touting Honest's product development and "direct connection with [its] community" as a competitive advantage. The Offering Documents also acknowledged the importance of customer reviews and Honest's ability to reformulate products to improve performance. The Offering Documents state:

> ***In-House Product Development Capabilities that Power Innovation***
>
> Product innovation lies at the heart of our business. ***We have built a high-performance product development team that sets new standards with a proven track record of bringing innovative, award-winning products to market. To maximize the impact of our product development capabilities, our direct connection with our community enables us to understand what consumers' needs are and inspires our product innovation pipeline, which we believe generates a significant competitive advantage over more traditional CPG peers***. Our product innovation is inspired by feedback from our consumers that we receive through multiple avenues, including through our internal customer service team, comments left by consumers on our social media platforms and product ratings on our website and retailer's websites. For example, we created and brought to market a new Stay Safe cleaning collection, a complete set of cleaning, sanitizing and disinfecting solutions, in less than six months after the onset of COVID-19. In 2020, 22% of our revenue was generated from stock keeping units, or SKUs, introduced in 2020. ***In addition to using these capabilities to innovate new products to bring to market, we also regularly reformulate or update existing products, improving***

*performance and expanding gross margin*. We have won over 100 awards, including the 2020 "Parents" Best for Baby Award and seven Allure Best of Beauty awards.

89.     The above statements were false and misleading statements of material fact when made because they failed to disclose the following material adverse facts, material adverse trends, material uncertainties, or significant risks that existed at the time of the IPO: (a) According to customers experiencing chemical irritations and rashes, leaks and blowouts, Honest's Clean Conscious Diaper reformulation was neither safe nor effective; (b) As a result, Honest's Clean Conscious Diaper was not "improving performance," as evidenced by a multitude of consumer reviews describing its defective features; (c) Honest was not capturing the benefits of its Diapers as a "strategic customer acquisition tool"; and (d) As a result of the Clean Conscious Diaper's new technology and defective design, Honest would—and did—lose customers and revenue.

### 2.     The Offering Documents Contained Misstatements and Omissions About Honest's COVID-19 Inventory Stock Up

90.     The Offering Documents failed to disclose the extent to which consumers' COVID-19 stockpiling of Honest products was negatively impacting the Company at the time of the IPO. Although the Offering Documents described the impact of COVID-19 on Honest's revenue and customer demand as unascertainable, in reality, at the time of the IPO, Honest was tracking inventory daily and monitoring trends monthly, such that the COVID-19 stock up later described by Defendant Vlahos as occurring "over the prior year period" was apparent at the time of the IPO. This is further confirmed by the CW-1 and CW-2. As a result, the Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements contained therein not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

91.     For example, the Offering Documents told investors that the Company benefitted

from the increased demand for Honest's products amidst the COVID-19 pandemic while stating

the impact of the COVID-19 pandemic on Honest's business could not be ascertained:

> **Impact of COVID-19**
>
> The COVID-19 pandemic has caused general business disruption worldwide
> beginning in January 2020. ***The full extent to which the COVID-19 pandemic will***
> ***directly or indirectly impact our cash flow, business, financial condition, results***
> ***of operations and prospects will depend on future developments that are***
> ***uncertain***.
>
> *       *       *
>
> We believe COVID-19 has been one of the drivers of demand in our Digital channel
> as consumers have shifted to online shopping amid the pandemic. Additionally, our
> Household and Wellness product category has benefitted from increasing demand
> for sanitization products. We accelerated our development timeline for certain
> product launches, launching our disinfecting spray and alcohol wipes in 2020.
>
> There is no assurance that we will continue to experience such increases in demand.
> ***We may see a decline in use of online shopping and demand for sanitization***
> ***products when the COVID-19 pandemic subsides***.

92.     Nevertheless, the Offering Documents also told investors that the Company's

omnichannel approach was "agnostic as to the channel where consumers purchase [its] products."

The Offering Documents stated, in pertinent part, as follows:

> ***Our omnichannel approach seeks to meet consumers however they want to shop,***
> ***balancing deep consumer connection with broad convenience and accessibility***.
> Since our launch, we have built a well-integrated omnichannel presence by
> expanding our retail accessibility across both Digital and Retail channels, including
> the launch of strategic partnerships with Costco, Target and Amazon in 2013, 2014
> and 2017, respectively. In 2020, we generated 55% and 45% of our revenue from
> our Digital and Retail channels, respectively. We maintain direct relationships with
> our consumers via our flagship digital platform, Honest.com, which allows us to
> influence brand experience and better understand consumer preferences and
> behavior. We increase accessibility of our products to more consumers through
> both the third-party pureplay ecommerce sites that, with Honest.com, comprise the
> rest of our Digital channel, and our Retail channel, which includes leading retailers

and their websites. Our products can be found in approximately 32,000 retail locations across the United States, Canada and Europe. ***This distinctive business model has allowed us to efficiently scale our business while remaining agnostic as to the channel where consumers purchase our products. Our integrated omnichannel presence provides meaningful benefits to our consumer which we believe is not easily replicated by our competitors***.

93.     The above statements were false and misleading statements of material fact when made because they failed to disclose the following material adverse facts, material adverse trends, material uncertainties, or significant risks that existed at the time of the IPO: (a) Contrary to the Offering Document's claim that the COVID-19 pandemic was good for Honest's business, retailers were destocking COVID-19 products and Honest's sales for those products were decreasing; (b) Honest produced daily reports detailing the Company's inventory and monitored inventory on a monthly basis; (c) Despite Honest's products being available "wherever customers shop," Honest's omnichannel strategy failed to account for changing customer needs as the pandemic lessened; (d) As Defendant Vlahos would later admit, Honest's COVID-19 stock up began as early as August 2020—nine months before the IPO; and (e) As a result, Honest was already seeing a decline in demand for COVID-19 related products at the time of the IPO.

### 3.     The Offering Documents Failed to Disclose and Misrepresented Significant Risks That Made the Offering More Speculative and Risky

94.     The Offering Documents falsely represented the negative impact of consumers' COVID-19 stock-up, decreasing demand, and Honest's omnichannel strategy which purportedly positioned the Company for continued growth. As a result, the Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements contained in the Offering Documents not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

95.     The Offering Documents inaccurately described as **_potential_**, certain future risks associated with consumer perception of the health and safety of Honest's product and demand for those products which "could" have an adverse effect on its business, financial condition, and results of operations, rather than disclosing the actual events and trends or uncertainties that had already manifested. The Offering Documents stated, in pertinent part, that:

> **_Economic downturns or a change in consumer preferences, perception and spending habits in the clean products categories, in particular, could limit consumer demand for our products and negatively affect our business_**.
>
> We have positioned our brand to capitalize on growing consumer interest in clean conscious products. The clean conscious consumer product industry is sensitive to national and regional economic conditions and the demand for the products that we distribute may be adversely affected from time to time by economic downturns that impact consumer spending, including discretionary spending. Future economic conditions such as employment levels, business conditions, housing starts, interest rates, inflation rates, energy and fuel costs and tax rates could reduce consumer spending or change consumer purchasing habits. Among these changes could be a reduction in the number of clean conscious consumer products that consumers purchase where there are alternatives, given that many products in this category often have higher retail prices than do their conventional counterparts.
>
> **_Further, the Diapers and Wipes, Skin and Personal Care and Household and Wellness markets in which we operate are subject to changes in consumer preference, perception and spending habits. Our performance depends significantly on factors that may affect the level and pattern of consumer spending in the markets in which we operate. Such factors include consumer preference, consumer confidence, consumer income, consumer perception of the safety and quality of our products and shifts in the perceived value for our products relative to alternatives_**. The Diapers and Wipes market is also subject to changes in birthrates, which have been declining in developed countries like the United States. In addition, media coverage regarding the safety or quality of, our products or the raw materials, ingredients or processes involved in their manufacturing may damage consumer confidence in our products. A general decline in the consumption of our products could occur at any time as a result of change in consumer preference, perception, confidence and spending habits, including an unwillingness to pay a premium or an inability to purchase our products due to financial hardship or increased price sensitivity, which may be exacerbated by the effects of the COVID-19 pandemic. If consumer preferences

shift away from clean products, our business, financial condition and results of operations could be adversely affected.

96.    The above statements were each inaccurate statements of material fact when made while noting only the ***potential*** negative impacts on its business, financial condition, and results of operations, the Offering Documents failed to disclose the following significant, ***then-existing*** material events and adverse trends or uncertainties that Honest ***had already been*** facing at the time of the IPO: (a) According to customers experiencing chemical irritations and rashes, leaks and blowouts, Honest's Clean Conscious Diaper reformulation was neither safe nor effective; (b) Honest's Clean Conscious Diaper was not achieving the pillars of Honest's "costovation" strategy, which emphasizes safety, sustainability, efficacy and design profile; (c) Honest was not capturing the benefits of its Diapers as a "strategic customer acquisition tool"; and (d) As a result of the Clean Conscious Diaper's new technology and defective design, Honest would lose customers and revenue.

97.    Further, the Offering Documents inaccurately described as potential, certain risks associated with perceived quality, safety and efficacy issues with Honest's products and social media scrutiny, which may have an adverse effect on its business, financial condition, and results of operations, rather than disclosing the actual events and trends or uncertainties that had already manifested. The Offering Documents stated, in pertinent part, that:

> ***Our brand and reputation may be diminished due to real or perceived quality, safety, efficacy or environmental impact issues with our products, which could have an adverse effect on our business, financial condition, results of operations and prospects***.
>
> We believe our consumers rely on us to provide them with clean, sustainable, well-designed, and effective products. ***Any loss of confidence on the part of consumers in our products or the ingredients used in our products, whether related to product contamination or product safety or quality failures, actual or perceived, environmental impacts, or inclusion of prohibited ingredients, or ingredients that***

*are perceived to be "toxic", could tarnish the image of our brand and could cause consumers to choose other products. Allegations of contamination or other adverse effects on product safety or efficacy or suitability for use by a particular consumer or on the environment, even if untrue, may require us to expend significant time and resources responding to such allegations and could, from time to time, result in a recall of a product from any or all of the markets in which the affected product was distributed. Any such issues or recalls could negatively affect our ability to achieve or maintain profitability and brand image.*

For example, in 2015, multiple class action lawsuits were filed against us claiming that certain of our products, including our sunscreen, were ineffective and were not "natural." In 2017, we settled these class action lawsuits by agreeing to labeling changes and a $7.4 million settlement fund. In 2016, multiple class action lawsuits were filed against us claiming that we misled buyers about ingredients in our laundry detergent, dish soap and multisurface cleaner. In 2017, we settled these class action lawsuits by agreeing to marketing or reformulating changes and a settlement fund of $1.6 million. We have also been the subject of litigation claiming our labels contain inaccurate or misleading information. In response, we are in the process of updating the language on certain of our labels. In addition, we voluntarily recalled certain of our baby wipes and baby powder products in 2017 and one of our bubble bath products in January 2021 due to concerns about potential contamination. These incidents negatively affected our brand image and required significant time and resources to address.

We also have no control over our products once purchased by consumers. For example, consumers may store or use our products under conditions and for periods of time inconsistent with approved directions for use or the listed "Period After Opening," or required warnings or other governmental guidelines on our labels, which may adversely affect the quality and safety of our products.

*If our products are found to be, or perceived to be, defective or unsafe, or if they otherwise fail to meet our consumers' expectations, our relationships with consumers could suffer, the appeal of our brand could be diminished, we may need to recall some of our products and/or become subject to regulatory action, and we could lose sales or market share or become subject to boycotts or liability claims*. In addition, safety or other defects in our competitors' products or products using the Honest name in other consumer categories, like beverages and pet food in which we do not own the Honest brand, could reduce consumer demand for our own products if consumers view them to be similar. Any such adverse effect could be exacerbated by our market positioning as a purveyor of clean, sustainable, well-designed, and effective products and may significantly reduce our brand value. *Issues regarding the safety, efficacy, quality or environmental impact of any of our products, regardless of the cause, may have an adverse effect on our brand, reputation and operating results. Further, the growing use of social and digital media by us, our consumers and third parties increases the speed and extent that information or misinformation and opinions can be shared. Negative publicity*

*about us, our brand or our products on social or digital media could seriously damage our brand and reputation. Any loss of confidence on the part of consumers in the quality, safety, efficacy or environmental suitability of our products would be difficult and costly to overcome, even if such concerns were based on inaccurate or misleading information. If we do not maintain the favorable perception of our brand, our business, financial condition, results of operations and prospects could be adversely affected.*

98.     The above statements were each inaccurate statements of material fact when made while noting only the potential negative impacts on its business, financial condition, and results of operations, the Offering Documents failed to disclose the following significant, then-existing material events and adverse trends or uncertainties that Honest had already been facing at the time of the IPO: (a) According to customers experiencing chemical irritations and rashes, leaks, and blowouts, Honest's Clean Conscious Diaper reformulation was neither safe nor effective; (b) Honest's Clean Conscious Diaper was not achieving the pillars of Honest's "costovation" strategy, which emphasizes safety, sustainability, efficacy and design profile; (c) Honest was not capturing the benefits of its Diapers as a "strategic customer acquisition tool"; and (d) As a result of the Clean Conscious Diaper's new technology and defective design, Honest would lose customers and revenue.

99.     Further, the Offering Documents inaccurately described as potential, certain risks associated with social media scrutiny, which may have an adverse effect on its business, financial condition, and results of operations, rather than disclosing the actual events and trends or uncertainties that had already manifested. The Offering Documents stated, in pertinent part, that:

*Use of social media and influencers may adversely affect our reputation or subject us to fines or other penalties.*

\*      \*      \*

*Negative commentary regarding us, our products or influencers and other third parties who are affiliated with us may also be posted on social media platforms and may be adverse to our reputation or business.* Influencers with whom we

maintain relationships could engage in behavior or use their platforms to communicate directly with our consumers in a manner that reflects poorly on our brand and may be attributed to us or otherwise adversely affect us. It is not possible to prevent such behavior, and the precautions we take to detect this activity may not be effective in all cases. Our target consumers often value readily available information and often act on such information without further investigation and without regard to its accuracy. The harm may be immediate, without affording us an opportunity for redress or correction.

100.    The above statements were each inaccurate statements of material fact when made while noting only the ***potential*** negative impacts on its business, financial condition, and results of operations, the Offering Documents failed to disclose the following significant, ***then-existing*** material events and adverse trends or uncertainties that Honest ***had already been*** facing at the time of the IPO: (a) According to customers experiencing chemical irritations and rashes, leaks and blowouts, Honest's Clean Conscious Diaper reformulation was neither safe nor effective; (b) Honest's Clean Conscious Diaper was not achieving the pillars of Honest's "costovation" strategy, which emphasizes safety, sustainability, efficacy and design profile; (c) Honest was not capturing the benefits of its Diapers as a "strategic customer acquisition tool"; and (d) As a result of the Clean Conscious Diaper's new technology and defective design, Honest would lose customers and revenue.

101.    Further, the Offering Documents inaccurately described as potential, certain risks associated with the impact of COVID-19, fluctuation in sales through the Company's retail and digital channels, and timing and success of Honest's product launches, which may have an adverse effect on its business, financial condition, and results of operations, rather than disclosing the actual events and trends or uncertainties that had already manifested. The Offering Documents stated, in pertinent part, that:

***Our quarterly operating results may fluctuate, which could cause our stock price to decline.***

***Our quarterly operating results may fluctuate for a variety of reasons, many of which are beyond our control, including:***

• ***fluctuations in revenue, including as a result of adverse market conditions due to the COVID-19 pandemic and the opening of retail and travel opportunities as the pandemic abates, the seasonality of market transactions and fluctuations in sales through our Retail and Digital channels;***
• the amount and timing of our operating expenses;
• our success in attracting new and maintaining relationships with existing retail and ecommerce partners;
• ***our success in executing on our strategy and the impact of any changes in our strategy;***
• ***the timing and success of product launches, including new products that we may introduce, such as our launch of clean conscious diapers in January 2021***;
• the success of our marketing efforts;
• ***adverse economic and market conditions, such as those related to the current COVID-19 pandemic, currency fluctuations and other adverse global events***;
• disruptions or defects in our technology platform, such as privacy or data security breaches, errors in our software or other incidents that impact the availability, reliability, or performance of our platform;
• disruptions in our supply chain, the ability of our third-party manufacturers to produce our products, ability of our distributors to distribute our products, or in our shipping arrangements;
• ***the impact of competitive developments and our response to those developments***;
• fluctuations in inventory and working capital;
• our ability to manage our business and future growth; and
• our ability to recruit and retain employees.

102.   The above statements particularly those concerning the launch of Honest's Clean Conscious Diapers, were each inaccurate statements of material fact when made while noting only the ***potential*** negative impacts on its business, financial condition, and results of operations, the Offering Documents failed to disclose the following significant, ***then-existing*** material events and adverse trends or uncertainties that Honest ***had already been*** facing at the time of the IPO: (a) According to customers experiencing chemical irritations and rashes, leaks, and blowouts, Honest's Clean Conscious Diaper reformulation was neither safe nor effective; (b) Honest's Clean Conscious Diaper was not achieving the pillars of Honest's "costovation" strategy, which

emphasizes safety, sustainability, efficacy and design profile; (c) Honest was not capturing the benefits of its Diapers as a "strategic customer acquisition tool"; and (d) As a result of the Clean Conscious Diaper's new technology and defective design, Honest would lose customers and revenue.

103.    The above statements particularly those concerning COVID-19, were each inaccurate statements of material fact when made while noting only the ***potential*** negative impacts on its business, financial condition, and results of operations, the Offering Documents failed to disclose the following significant, ***then-existing*** material events and adverse trends or uncertainties that Honest ***had already been*** facing at the time of the IPO: (a) Despite products being available "wherever customers shop," Honest's omnichannel strategy was not overcoming changing customer needs as the pandemic lessened; (b) Honest produced daily reports detailing the Company's inventory and monitored inventory trends on a monthly basis; (c) At least as early as April 2021, it was clear that COVID-19 products were "not moving" and Honest's internal reporting showed that these products had been trending down for some time; and (d) As Defendant Vlahos would later admit, Honest's COVID-19 stock up began as early as August 2020—nine months before the IPO.

104.    The Offering Documents also inaccurately described as ***potential***, certain risks associated with Honest's ability to acquire new customers and retain existing customers, which may have an adverse effect on its business, financial condition, and results of operations, rather than disclosing the actual events and trends or uncertainties that had already manifested. The Offering Documents stated, in pertinent part, that:

> ***If we fail to cost-effectively acquire new consumers or retain our existing consumers, our business could be adversely affected. Our sales and profit are dependent upon our ability to expand our existing consumer relationships and acquire new consumers***.

Our success, and our ability to increase revenue and achieve profitability, depend in part on our ability to cost-effectively acquire new consumers, retain existing consumers and keep existing consumers engaged so that they continue to purchase our products. Our diaper business is also a strategic consumer acquisition tool that fuels growth for baby wipes, personal care, and other products. While we intend to continue to invest significantly in sales and marketing to educate consumers about our brand, our values and our products, there is no assurance that these efforts will generate further demand for our products or expand our consumer base. Our ability to attract new consumers and retain our existing consumers will depend on, among other items, the perceived value and quality of our products, consumer demand for clean, sustainable, thoughtfully designed and effective products at a premium, competitive offerings, our ability to offer new and relevant products and the effectiveness of our marketing efforts. We may also lose loyal consumers to our competitors if we are unable to meet consumer demand in a timely manner. ***If we are unable to cost-effectively acquire new consumers, retain existing consumers and keep existing consumers engaged, our business, financial condition, results of operations and prospects could be adversely affected***.

105.    The above statements were each inaccurate statements of material fact when made while noting only the ***potential*** negative impacts on its business, financial condition, and results of operations, the Offering Documents failed to disclose the following significant, ***then-existing*** material events and adverse trends or uncertainties that Honest ***had already been*** facing at the time of the IPO: (a) According to customers experiencing chemical irritations and rashes, leaks and blowouts, Honest's Clean Conscious Diaper reformulation was neither safe nor effective; (b) Honest's Clean Conscious Diaper was not achieving the pillars of Honest's "costovation" strategy, which emphasizes safety, sustainability, efficacy and design profile; (c) Honest was not capturing the benefits of its Diapers as a "strategic customer acquisition tool"; and (d) As a result of the Clean Conscious Diaper's new technology and defective design, Honest would lose customers and revenue.

106.    The above statements were also each inaccurate statements of material fact when made while noting only the ***potential*** negative impacts on its business, financial condition, and results of operations, the Offering Documents failed to disclose the following significant, ***then-***

*existing* material events and adverse trends or uncertainties that Honest *had already been* facing

at the time of the IPO: (a) Despite products being available "wherever customers shop," Honest's

omnichannel strategy was not overcoming changing customer needs as the pandemic lessened; (b)

Honest produced daily reports detailing the Company's inventory and monitored inventory trends

on a monthly basis; (c) At least as early as April 2021, it was clear that COVID-19 products were

"not moving" and Honest's internal reporting showed that these products had been trending down

for some time; and (d) As Defendant Vlahos would later admit, Honest's COVID-19 stock up

began as early as August 2020—nine months before the IPO.

107.    The Offering Documents also inaccurately described as *potential*, certain risks

associated with the impact of COVID-19, which *may* have an adverse effect on its business,

financial condition, and results of operations, rather than disclosing the actual events and trends or

uncertainties that had already manifested. The Offering Documents stated, in pertinent part, that:

> **The COVID-19 pandemic could have an adverse effect on our business, financial condition, results of operations and prospects**.

> \*       \*       \*

> **The extent of the COVID-19 pandemic's effect on our operational and financial performance will depend on future developments, including the duration and intensity of the pandemic, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. As a result, it is not currently possible to ascertain the overall impact of the COVID-19 pandemic on our business**. However, if the pandemic continues to persist as a severe worldwide health crisis, the disease could have an adverse effect on our business, financial condition, results of operations and prospects, and may also have the effect of heightening many of the other risks described in this "Risk Factors" section.

108.    The above statements were each inaccurate statements of material fact when made

while noting only the *potential* negative impacts on its business, financial condition, and results

of operations, the Offering Documents failed to disclose the following significant, *then-existing*

material events and adverse trends or uncertainties that Honest *had already been* facing at the time

of the IPO: (a) Despite products being available "wherever customers shop," Honest's omnichannel strategy was not overcoming changing customer needs as the pandemic lessened; (b) Honest produced daily reports detailing the Company's inventory and monitored inventory trends on a monthly basis; (c) At least as early as April 2021, it was clear that COVID-19 products were "not moving" and Honest's internal reporting showed that these products had been trending down for some time; and (d) As Defendant Vlahos would later admit, Honest's COVID-19 stock up began as early as August 2020—nine months before the IPO.

### F.   The Truth is Revealed – Post-IPO Events Demonstrate that the Offering Documents Were Materially False and Misleading at the Time of the Offering

109.    In its first press release just weeks after the IPO, on June 16, 2021, Honest reported the Company's first quarter 2021 financial results. Honest's revenue in its Company's Diapers and Wipes category was down, and the Company recorded a $4.5 million net loss in the first quarter of 2021 as compared to net income of $0.6 million in the first quarter of 2020.

110.    On the same day, during the earnings call to discuss the quarterly results, Defendant Kennedy explained that the decrease in Diapers and Wipes was attributable to COVID-19 pantry loading back in 2020 and the Company's transition to Clean Conscious Diapers, stating:

> ***Starting with Diapers and Wipes, the category decreased 2% as we transitioned to our Clean Conscious Diaper and lapped the acceleration in Diapers and Wipes related to COVID-19 pantry loading in the first quarter of 2020***. Of note, diaper growth was positive in Q1 behind our new diaper launch but was offset by a decrease in wipes as we lapped consumer stock-up behavior from Q1 2020. Based on consumption data for the last 12 weeks ending May 16, our diaper business was up 13% while the overall market declined 1%.

111.    Defendant Kennedy also explained that Honest was starting to see some retailers destock sanitization and disinfecting products, stating in relevant part:

> Household and Wellness grew 53%, fueled by our standardization and disinfecting products that we introduced in the second half of 2020. ***While we were still able to see significant growth in Household and Wellness, we are starting to see***

*household and retailers destock sanitization and disinfecting products as more consumers become vaccinated and return to their pre-COVID routine*.

112.    In response to an analyst question regarding Honest's Clean Conscious Diaper initiative going forward, Defendant Vlahos acknowledged some dissatisfaction but claimed Honest had the ability to "address [ ] key consumer dissatisfiers":

> Yes, I'll take the first one, Dana, thank you for the question. ***And I would say on the [Clean] Conscious Diaper is we've kind of built out that innovation. We do this type of work when it comes to the performance and being able to address these key consumer dissatisfiers. And we've done this in a way now where we're also increasing the margin structure against that business. So it's got the right proposition for us because we talk about good growth always, which is this consistency around not just driving top line but also the margin expansion components that we want on the business. So that's rooted in the current proposition***.

113.    On this news, the Company's stock price fell $1.30 per share, or 7% to close at $16.35 on June 17, 2021.

114.    The next quarter, on August 13, 2021, Honest issued a press release reporting the Company's second quarter 2021 financial results and a net loss of $20 million for the second quarter 2021 as compared to a net loss of only $0.4 million for the second quarter of 2020. The Company noted its revenue grew only 3% as compared to the second quarter of 2020 because it was negatively impacted by "an estimated $3.7 million COVID-19 stock-up impact primarily in Diapers and Wipes in the prior year period."

115.    Honest further reported that revenue for its top category, Diapers and Wipes, declined 2% compared to the second quarter of 2020 and revenue for Household and Wellness declined 6% from the second quarter of 2020 as "sales have been softer than expected as consumer demand has decreased as more consumers have become vaccinated and retailers continue to manage heavy inventories of sanitization and disinfecting products in stores." Gross margin decreased by 50 basis points from the second quarter of 2020.

116.     Honest's digital channel revenue also decreased 24% to $34.8 million in the second quarter of 2021 as compared to the second quarter of 2020, due largely to the reduction in inventory on-hand by one of Honest's "key digital partner[s]" who "cut inventory in consumables in the second quarter to free up space for other products." During the quarter, revenue from that customer declined by $6.4 million.

117.     On the related earnings call held the same day to discuss these results, Defendant Vlahos acknowledged the true extent of Honest's COVID-19 stock up, noting Honest's "mid-single-digit growth for the quarter on [its] Diaper business despite COVID-19 stock-up impact in the year ago period."

118.     Defendant Kennedy noted that "[t]rends for the back half of the year remain volatile as we navigate an environment that is dynamic with significant input cost pressure and continuing uncertainty around the COVID-19 pandemic and its impact on consumer behavior."

119.     On this news, the Company's stock price fell $3.98 per share, or 28%, to close at $10.07 per share on August 13, 2021.

120.     In an August 13, 2021 report from Morgan Stanley, analysts noted "[c]learly the quarter is disappointing, particularly so soon after the IPO" recognizing that Honest's Diapers and Wipes segment was down -2% year-over-year "as the [C]ompany cycles through elevated comparisons due to pandemic pantry loading." The report recognized "slowing e-commerce momentum, a drop in demand following COVID stock up" as among the downside risks.

121.     On August 19, 2021, the Company's stock closed at a low of $9.16 per share, a nearly 43% decline from the IPO price. Since its IPO, the value of Honest's common stock has collapsed from its $16 per share offering price to as low as $5.54 per share.

## DAMAGES TO THE COMPANY

122.    Honest has been, and will continue to be, severely damaged and injured by the Defendants' misconduct. As a direct and proximate result of the Defendants' conduct, Honest has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

      a.  costs incurred in compensation and benefits paid to Defendants that violated federal securities laws;

      b.  substantial loss of market capital;

      c.  costs already incurred and to be incurred defending the Related Securities Action; and

      d.  any fines or other liability resulting from the Company's violations of federal law.

123.    In addition, Honest's business, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired. The credibility and motives of management are now in serious doubt.

124.    The wrongdoing complained of herein has irreparably damaged Honest's corporate image and goodwill. For at least the foreseeable future, Honest will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Honest's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

125.    Plaintiff brings this action derivatively in the right and for the benefit of Honest to redress injuries suffered, and to be suffered, by Honest as a direct result of violations of federal securities laws by the Defendants. Honest is named as a Nominal Defendant solely in a derivative

capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

126.    The Board of Honest, at the time this action was commenced, consisted of Nick Vlahos, Jessica Warren, James D. White, Katie Bayne, Susan Gentile, Eric Liaw, Avik Pramanik, Julia M. Brown, and John R. Hartung, a total of 9 individuals.

127.    Plaintiff has not made any demand on the Board to bring the allegations herein because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand is Futile as to Defendant Vlahos Because of His**
**Principal Professional Occupation as the Company's CEO**

128.    Defendant Vlahos joined Honest as the Company's CEO and a member of the Board in March 2017. As such, it is reasonable to infer that Defendant Vlahos would have been aware of the impact that COVID-19 had on the Company's business. In his role as CEO of the Company for the fiscal years of 2021 and 2020, Defendant Vlahos received $13,864,207 and $6,800,907 in total compensation, respectively. The Company does not claim that Defendant Vlahos is an independent director, and because his primary source of income and employment, as well as his professional reputation, are inextricably linked to his position as the CEO of Honest, Defendant Vlahos is incapable of acting independently and demand is futile upon him.

**Demand is Futile as to Defendant Warren**
**Because of Her Role as the Founder and CCO of the Company**

129.    Defendant Warren founded Honest and became the Company's CCO in 2011. Defendant Warren was the Chair of the Board from 2018 until 2021. As such, it is reasonable to infer that Defendant Warren would have been aware of the impact that COVID-19 had on the Company's business. In her role as CCO of the Company for the fiscal years of 2021 and 2020, Defendant Warren received $7,981,543 and $2,330,713 in total compensation, respectively. The

Company does not claim that Defendant Warren is an independent director, and because Warren is the founder of the Company, her personally reputation is inextricably linked to the Company's public image and success. Likewise, because Defendant Warren is the Company's CCO and former Chair of the Board, her professional reputation is inextricably linked to the public image and success of the Company. For the foregoing reasons, Defendant Warren is incapable of acting independently and demand is futile upon him.

**Demand is Futile as to Defendants Vlahos, Warren, Bayne, E. Liaw, and Pramanik**

130.    As alleged above, five of the nine current Board members, including Defendants Vlahos, Warren, Bayne, E. Liaw, and Pramanik face a substantial likelihood of liability for their misconduct. As more fully detailed herein, Defendants Salz Vlahos, Warren, Bayne, E. Liaw, and Pramanik participated and approved the improper Offering Documents in their capacity as Honest directors.  As a result of their access to and review of internal corporate documents, conversations and connections with other corporate officers, employees, and directors, and attendance at management and Board meetings, each of these Defendants knew the adverse, nonpublic information regarding Honest's business and financial prospects before the issuance of the Offering Documents, yet each failed to prevent its release or correct the misleading and incomplete information contained therein. Moreover, as directors of Honest, these Defendants each had the duty and opportunity to discuss material information with management and fellow directors at any of the Board meetings that occurred before the Company's IPO, as well as at meetings of committees of the Board. Despite these duties, these Defendants caused or allowed, by their actions or inactions, the improper statements to be disseminated by Honest to the investing public and the Company's shareholders in connection with the IPO.

131.     Accordingly, the above-named Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartiality to consider a demand to sue themselves in the present action.

## COUNT I

### Against the Individual Defendants for Contribution Under Section 11 of the Securities Act

132.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

133.     As a result of the conduct and events alleged above, Honest has been named as a defendant in the Related Securities Action brought on behalf of Honest shareholders in which it is a joint tortfeasor in claims brought under Section 11 of the Securities Act of 1933.

134.     Federal law provides Honest with a cause of action against other alleged joint tortfeasors under Section 11(f).

135.     Accordingly, Plaintiff, on behalf of Honest, hereby claims contribution against the Individual Defendants, each of whom has been named in the currently pending Related Securities Action as a joint tortfeasor with Honest under Section 11, or if joined in such actions, would be liable for the same damages as Honest.

136.     Honest claims no right to indemnification under the federal securities laws from them in this count, but rather only claims contribution.

137.     The plaintiffs in the Related Securities Action allege that the Offering Documents for the IPO were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

138.    Honest is the registrant for the IPO. The Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

139.    As issuer of the shares, Honest is strictly liable to plaintiffs and the Class for the misstatements and omissions alleged in the Related Securities Action.

140.    The plaintiffs in the Related Securities Action allege that none of the Individual Defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

141.    By reasons of the conduct therein alleged, each Individual Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

142.    The plaintiffs in the Related Securities Action allege that plaintiffs acquired Honest securities pursuant and/or traceable to the Offering Documents for the IPO.

143.    The plaintiffs in the Related Securities Action allege that plaintiffs and the Class have sustained damages. The value of Honest securities has declined substantially due to the Individual Defendants' violations.

144.    Accordingly, the Individual Defendants are liable for damages under Section 11(f) of the Securities Act, and, if Honest were to be held liable in the Related Securities Action, the Individual Defendants would be liable to it for contribution.  Plaintiff hereby derivatively claims such right of contribution on behalf of Honest.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

145.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

146.    The Individual Defendants owed and owe Honest fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Honest the highest obligation of good faith, fair dealing, loyalty, and due care.

147.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision.

148.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the business prospects of the Company. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

149.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Honest has sustained significant and actual damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

150.    Plaintiff, on behalf of Honest, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

151.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

152.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Honest.

153.    The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Honest.

154.    Plaintiff, as a shareholder and representative of Honest, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other

compensation obtained by the Individual Defendants from their wrongful conduct and breaches of fiduciary duty.

155.    Plaintiff, on behalf of Honest, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Waste of Corporate Assets

156.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

157.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

158.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things: (a) paying excessive compensation and bonuses to certain executive officers; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Related Securities Action.

159.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

160.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Honest and that Plaintiff is an adequate representative of the Company;

B.      Determining and awarding to Honest the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

C.      Directing Honest and Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Honest and its shareholders from a repeat of the damaging events described herein;

D.      Awarding Honest contribution from the Individual Defendants, and each of them;

E.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

F.      Granting such other and further equitable relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.


Dated: October 19, 2022

OF COUNSEL:

Joshua M. Lifshitz
**LIFSHITZ LAW PLLC**
1190 Broadway
Hewlett, New York 11557
Telephone: (516) 493-9780
Facsimile: (516) 280-7376

*Attorneys for Plaintiff*

**BIELLI & KLAUDER, LLC**

*/s/ Ryan M. Ernst*
Ryan M. Ernst (No. 4788)
1204 N. King Street
Wilmington, DE 19801
Tel: (302) 803-4600
rernst@bk-legal.com

*Attorneys for Plaintiff*